# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 40

### OCTOBER TERM, A.D. 2013

### March 21, 2014

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF:

RICHARD J. DELACASTRO,

Appellant
(Petitioner),

v.

STATE OF WYOMING, ex rel.,
WYOMING WORKERS' SAFETY AND
COMPENSATION DIVISION,

Appellee
(Respondent).

S-13-0141

*Appeal from the District Court of Laramie County*
The Honorable Thomas T.C. Campbell, Judge

*Representing Appellant:*
    Robert A. Nicholas, Nicholas Law Office, Cheyenne, Wyoming.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney
    General; Michael J. Finn, Senior Assistant Attorney General; Michael T. Kahler,
    Senior Assistant Attorney General.

*Before KITE, C.J., and HILL, VOIGT\*, BURKE, and DAVIS, JJ.*

*Justice Voigt retired effective January 3, 2014.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KITE, Chief Justice.**

[¶1]   Richard J. Delacastro suffered a work-related injury to his right hip in 2007.  In 2009, the State of Wyoming ex rel. Wyoming Workers' Safety and Compensation Division (the Division) denied, as unrelated to his work injury, requests for testing and treatment of pain in his back.  After a contested case hearing, the Office of Administrative Hearings (OAH) reversed the Division's final determination, directed payment of Mr. Delacastro's outstanding medical bills and ordered that one additional test be performed to determine whether his back problems were associated with his work injury.  The parties submitted the results of the test, which were normal, and the hearing examiner ordered that Mr. Delacastro was not entitled to further benefits for his back.

[¶2]   The district court affirmed the OAH decision, and Mr. Delacastro appealed to this Court.  We conclude substantial evidence supports the OAH decision that Mr. Delacastro did not satisfy his burden of proving additional testing and treatment of his back were related to his work injury; however, we clarify that future treatment associated with the original hip injury may be submitted for administrative review.  We affirm, as modified.

**ISSUES**

[¶3]   Mr. Delacastro presents the following issues for this Court's consideration:

> 1. Is the OAH's decision denying all future medical benefits for [Mr. Delacastro's] ongoing right hip and thigh pain supported by substantial evidence, arbitrary or otherwise contrary to law?
>
> 2. Is the OAH's decision denying additional diagnostic testing supported by substantial evidence, arbitrary or otherwise contrary to law . . .?

The Division phrases the issue on appeal as:

> In 2007, Delacastro injured his right hip, and the Department ruled this was a compensable work place injury.  Nearly two years later, in 2009, Delacastro returned to his physician and underwent an MRI to diagnose "back pain."  The Division denied coverage for Delacastro's 2009 medical treatment, concluding it was unrelated to his 2007 hip injury.  At the contested case hearing, Delacastro argued that he actually injured his back in 2007, not his hip, and this 2007 back injury caused his 2009 symptoms.  After ordering further investigation, the hearing examiner ruled that Delacastro

1

failed to meet his burden to prove that he suffered a back injury in 2007 and that this back injury caused his symptoms in 2009. Does substantial evidence support the hearing examiner's decision?

**FACTS**

[¶4] Mr. Delacastro was the director of human resources at Cheyenne Regional Medical Center. On June 29, 2007, he was carrying boxes of personnel files up some stairs and felt a "tear or pinch" in his right leg. He believed he had pulled a muscle, and waited a couple of weeks hoping the injury would heal.

[¶5] Mr. Delacastro's right hip and leg continued to bother him, and on July 16, 2007, he filed a report of injury with the Division stating that he "was carrying trash from the basement of the HR house up the stairs and felt a pinch in the right hip." He saw Dr. Philip Sharp who diagnosed him with a right hip strain and lateral femoral cutaneous nerve irritation.[1] Dr. Sharp prescribed physical therapy, and Mr. Delacastro attended a few therapy sessions. On July 24, 2007, he stated that he was doing better and did not have any pinching, so he canceled his final therapy appointment.

[¶6] On August 30, 2007, Mr. Delacastro returned to physical therapy with complaints of weakness and pain in his right hip. After five visits, he was discharged from physical therapy, and the discharge notes stated that Mr. Delacastro reported his symptoms had improved 90%, he could jog a short distance without pain, and his "quad strength" was improving. He told the physical therapist that he had been hunting over the weekend "and walked a lot without increased symptoms." He stated that he saddled his horse at least once while on that hunting trip.

[¶7] Mr. Delacastro left his job at Cheyenne Regional Medical Center and did not seek additional treatment for his injury until June 2009, although he did report numbness and tingling in his feet to another doctor in 2008. That doctor thought his cholesterol medication may be causing the symptoms and advised him to stop taking it. On June 2, 2009, Mr. Delacastro returned to Dr. Sharp with complaints of pain in his back, both thighs and numbness in his feet. He told Dr. Sharp that his symptoms were a progression of the same discomfort he had after the 2007 work injury and he had never really improved. Dr. Sharp stated in his notes: "I think there is enough connection and symptoms to consider this possibly related" to the initial injury and referred him to a neurosurgeon, Dr. Warren Roberts.

---

[1] "The lateral femoral cutaneous nerve is a branch of the lumbar plexus, exiting the spinal cord between the L2 and L3 vertebrae. . . . Neuropathies of the lateral femoral cutaneous nerve can arise from many situations, and often manifest as sensory loss or pain, which can be tingling, aching, or burning." www.healthline.com.

[¶8]    Dr. Roberts ordered several tests including nerve conduction studies, electromyography, MRIs and X-rays of the lumber and thoracic spine.  Although the tests revealed some mild abnormalities including an arachnoid[2] cyst in the thoracic spine, Dr. Roberts was unable to make a diagnosis and sent Mr. Delacastro for additional physical therapy to rule out "lumbar pathology."  Mr. Delacastro was evaluated by a physical therapist but did not continue with therapy because he could not afford it.

[¶9]    The Division issued a final determination on July 13, 2009, denying coverage for treatment of his back, finding that it was not related to the 2007 right hip injury which had resolved by September 2007.  Mr. Delacastro objected to the Division's final determination, stating that the injury was "never to [his] hip" and the symptoms in his right leg "continue[d] exactly as first reported" with "no cessation."  The matter was referred to the OAH for a contested case hearing.

[¶10] On December 24, 2009, Mr. Delacastro saw Dr. Kenneth Pettine, a spinal specialist.  After reviewing Mr. Delacastro's medical records, Dr. Pettine believed that he may have suffered an annular tear to the L2/L3 vertebrae, which would manifest itself initially as a hip flexor injury.  He recommended a discography be performed to determine if there was a tear and stated that such a tear would be consistent with Mr. Delacastro's reported injury.

[¶11] On March 15, 2010, Dr. Paul Williams performed an independent medical examination (IME) of Mr. Delacastro.  Dr. Williams reviewed his medical history, performed an examination, and concluded Mr. Delacastro's initial injury was a strained right hip which occurred at work in June 2007 but there was no evidence of a back injury.  He noted that Mr. Delacastro showed symptoms of sensory peripheral neuropathy in both feet, but that condition was not related to the work injury.  He disagreed with Dr. Pettine's recommendation for a discography, stating that some literature said the test was a "poor localizer of pain generators," and that Mr. Delacastro did not need any further treatment of his lumbar spine.

[¶12] Dr. Pettine responded to Dr. Williams' conclusions in a letter dated April 23, 2010.  He stated that other literature supported the use of a discography.  He concluded: "I believe discography would either 100% prove the etiology of [Mr. Delacastro's] ongoing symptoms or it would prove the lumbar spine to not be the source of his symptoms."

[¶13] The OAH held a contested case hearing on April 27, 2010.  Mr. Delacastro testified and provided his medical records and the deposition of Dr. Pettine in support of

---

[2] The arachnoid is a "delicate membrane that encloses the spinal cord and brain."  American Heritage Science Dictionary (2002).

his position that he injured his lumbar spine at work in 2007. The Division did not present any testimony but relied upon its cross examination of Mr. Delacastro, the exhibits (which included Dr. Williams' IME report), and the deposition transcripts.

[¶14] The OAH issued an unusual decision on May 26, 2010,[3] stating:

> [T]his Office finds and concludes Delacastro proved the need for a discogram[4] to either rule in or rule out damage to the L2-3 level of his spine and the attendant cause of that damage, if found. This Office finds that a discogram should be approved on a rule out basis. In the event the discogram demonstrates an annular tear at L2-L3, this Office finds Delacastro's pain symptoms in his leg, hip and back are related to the June 29, 2007 work injury. However, in the event the discogram fails to show an annular tear at L2-L3, this Office finds Delacastro's pain symptoms in his hip, leg and back are not work related. A positive discogram will add weight to Dr. Pettine's opinion. A negative discogram will leave this Office with two opinions. Dr. Williams' opinion will have been validated by the negative discogram. Thus, in that event, Delacastro will have failed to carry his burden of proof.

(footnote added). A few days later, on June 1, 2010, Mr. Delacastro filed a motion seeking clarification of the agency order with regard to whether the outstanding medical bills from Dr. Sharp, Dr. Roberts and Dr. Pettine should be paid by the Division. While waiting for a ruling on the motion for clarification, Mr. Delacastro filed a petition for judicial review in the district court. On July 9, 2010, the OAH issued an order on the motion for clarification, stating that Mr. Delacastro's medical bills up to and including the discography should be paid.

[¶15] In the meantime, Mr. Delacastro underwent a lumbar discography, which showed no "pain reproduction" at the lumbar discs from L2 to S1. Mr. Delacastro filed a motion to supplement the record with the report from the discography and stated: "Because the discogram came back normal, Dr. Pettine has advised Mr. Delacastro to under go [sic] a nerve block at the L2-3 to determine the cause of his ongoing pain." The OAH issued an order on the motion to supplement the record which reviewed the facts and procedural history of the case, granted the motion to supplement the record with the results of the

---

[3] The order was incorrectly dated May 26, 2009.

[4] Discography is also referred to as discogram.

4

discography, and denied Mr. Delacastro's request for additional medical testing and/or treatment of his back.

[¶16]  The district court issued a decision on Mr. Delacastro's petition for review on May 28, 2013, affirming the OAH decision.[5]  Mr. Delacastro then appealed to this Court.

## STANDARD OF REVIEW

[¶17]  Judicial review of an agency's decision is governed by Wyo. Stat. Ann. § 16-3-114(c):

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> (B) Contrary to constitutional right, power, privilege or immunity;
>
> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>
> (D) Without observance of procedure required by law; or

---

[5]  Both parties had filed their briefs in the district court by January 14, 2011.  There is no explanation as to why the district court did not issue a decision until over two years later.

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Under § 16-3-114(c), we review the agency's findings of fact by applying the substantial evidence standard. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." *Bush v. State ex rel. Wyo. Workers' Comp. Div.,* 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005) (citations omitted).

[¶18] When an agency determines the claimant did not satisfy his burden of proof, we apply the following standard:

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. *See, Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.,* 882 P.2d 858, 860-61 (Wyo. 1994); *Spiegel,* 549 P.2d at 1178 (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale,* ¶ 22, 188 P.3d at 561.

[¶19] The arbitrary and capricious standard is also available as a " 'safety net' to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Id.,* ¶ 23, 188 P.3d at 561, quoting *Newman,* ¶ 23, 49 P.3d at 172. In all cases, we review an agency's conclusions of law *de novo* and affirm only when the

agency's conclusions are in accordance with the law. *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo. 2010); *Dale,* ¶ 26, 188 P.3d at 561–62.

## DISCUSSION

### 1. *Denial of All Future Treatment*

[¶20] Mr. Delacastro asserts that the OAH erred by denying benefits for all future treatment, including treatment of his work-related hip injury. Certain aspects of the OAH decision could be construed as denying all benefits for future treatment of his hip injury. However, a review of the entire decision clearly demonstrates the hearing examiner recognized that Mr. Delacastro had suffered a work-related injury to his hip.

[¶21] The focus of the contested case hearing was on whether treatment of his back was causally related to the work injury; there was no dispute over whether Mr. Delacastro had suffered a work related hip injury in 2007. In fact, the Division's expert, Dr. Williams, specifically acknowledged that Mr. Delacastro had suffered a right hip injury at work. Thus, the Division states on appeal that Mr. Delacastro may seek future benefits for treatment of his hip, which would be subject to a "separate administrative determination where he must show that the treatment is related to his original right hip injury." We agree and, to the extent the OAH order is inconsistent, it is modified.

### 2. *Substantial Evidence Review of Back Treatment*

[¶22] The OAH concluded Mr. Delacastro failed to prove his back problems were related to his earlier hip injury. A workers' compensation claimant has the burden of proving each of the essential elements of his claim, including causation, by a preponderance of the evidence. *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo. 2011). A claimant must demonstrate that a causal connection exists between a work injury and the injury for which worker's compensation benefits are being sought. *Id.*

[¶23] The fact-finder in a contested case hearing, in this case the OAH, must evaluate the medical records and testimony, including medical expert testimony, and determine the weight of the available evidence. *Id.,* ¶ 24, 247 P.3d at 852. The agency "'is entitled to disregard an expert opinion if [it] finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant.'" *Watkins v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 49, ¶ 25, 250 P.3d 1082, 1090-91 (Wyo. 2011), quoting *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2005 WY 148, ¶ 15, 123 P.3d 143, 148 (Wyo. 2005).

[¶24] Mr. Delacastro's position was that he actually injured his lower back, rather than his hip, when he was carrying the boxes at work in June 2007. Dr. Pettine testified that an annular tear at L2-L3 could manifest itself in hip pain, which could be mistaken as a hip flexor strain. He also confirmed that the symptoms could worsen over time and involve the back, legs and feet. The hearing examiner accepted Dr. Pettine's opinion and concluded that a discography of the L2-L3 vertebrae was compensable under the "rule out" doctrine.

[¶25] In *Snyder v. State ex rel. Wyo. Workers' Comp. Div.,* 957 P.2d 289, 295 (Wyo. 1998), we concluded that "[a]n appropriate diagnostic measure is not non-compensable merely because it fails to reveal an injury which is causally connected to an on-the-job injury." In *Mitcheson v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2012 WY 74, ¶¶ 22-23, 277 P.3d 725, 734-35 (Wyo. 2012), we noted that such diagnostic tests are appropriate to "rule out" other causes of a patient's symptoms. To be compensable under the "rule out" doctrine, the employee must produce an "objective indication of a physiologic connection between the claimant's injury and the diagnostic measure at issue." *Id.,* ¶ 23, 277 P.3d at 734-35.

[¶26] The hearing examiner generally agreed with Mr. Delacastro's position and specifically approved all of his treatment and tests up to and including the discography. Mr. Delacastro argues, however, the record does not support the hearing examiner's conclusion that, based upon the results of the discography, further diagnosis or treatment of lumbar back problems were not compensable.

[¶27] The hearing examiner's ruling is amply supported by the record. Dr. Williams opined that there was not even a factual basis to justify the discography; nevertheless, the OAH allowed it. After the discography came back normal, Mr. Delacastro sought additional tests and treatment on his lumbar back, including a nerve root block recommended by Dr. Pettine.[6] The record does not support additional testing or procedures on his lumbar spine.

[¶28] Dr. Pettine testified that Mr. Delacastro's symptoms were consistent with an annular tear at L2/L3. He stated the "discography would either 100% prove the etiology of his ongoing symptoms or it would prove the lumbar spine not to be the source of his symptoms." The OAH took Dr. Pettine's opinion at face value and ordered the Division to pay for the discography. The hearing examiner stated that the results of the discography would determine whether further treatment of Mr. Delacastro's back would be covered. The discography was negative, and consistent with its earlier ruling, the hearing examiner concluded the treatment and tests up to and including the discography

---

[6] The record is unclear as to whether the nerve block procedure was presented to the Division for administrative review prior to asking the OAH to approve it. Because neither party takes issue with the procedure, we will not address it.

would be covered by the Division, but any further testing and/or treatment of Mr. Delacastro's back would not be. This conclusion was supported by substantial evidence as it was not contrary to the overwhelming weight of the evidence. Indeed, it was unquestionably supported by the evidence presented at the hearing, including the testimony of Mr. Delacastro's treating physician, Dr. Pettine.

[¶29]   Affirmed, as modified.