# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 153

### OCTOBER TERM, A.D. 2014

### December 2, 2014

IN THE MATTER OF THE WORKER'S
COMPENSATION CLAIM OF:

PHYLIS STEVENS,

Appellant
(Petitioner),

v.                                                                          S-14-0076

STATE OF WYOMING, ex rel.,
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS' SAFETY AND
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Sublette County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellant:*
    F. Gaston Gosar of F. Gaston Gosar, P.C., Pinedale, Wyoming.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney
    General; Michael J. Finn, Senior Assistant Attorney General; Samantha Caselli,
    Assistant Attorney General.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.
Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building,
Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be
made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   The Wyoming Department of Workforce Services, Workers' Safety and Compensation Division (Division) determined that Phylis Stevens' avascular necrosis (AVN) in her right hip was not caused by her October 2010 slip and fall at work, and denied her claim for medical treatment of the AVN.  After a contested case hearing, the hearing examiner for the Office of Administrative Hearings (OAH) agreed with the Division that Mrs. Stevens' right hip AVN was not caused by her fall at work.  The district court affirmed the decision, and Mrs. Stevens appealed.  We affirm.

*ISSUES*

[¶2]   1.   Was there substantial evidence to support the hearing examiner's determination that Mrs. Stevens' fall did not cause the avascular necrosis in her right hip?

2.   The hearing examiner concluded that the absence of evidence of disease prior to the work-related injury and the presence of the disease afterwards was not sufficient to establish a causal link.  Was that conclusion in accordance with the law?

*FACTS*

[¶3]   On October 25, 2010, Phylis Stevens slipped and fell down a flight of stairs outside of her workplace, the Pinedale Aquatic Center (PAC).  Mrs. Stevens crawled back into the PAC where she was assisted by several of her co-workers.

[¶4]   Shortly thereafter, her husband transported her to the Pinedale Medical Clinic.  At the clinic, Mrs. Stevens was seen by a physician's assistant who diagnosed fractures to her fourth finger and fifth metacarpal in her left hand.  According to Mrs. Stevens' intake form, she was ambulatory on arrival, her "chief complaint" was pain in her left hand, and she denied any other injuries from the fall.  She was referred to Teton Orthopedics for surgery on her hand.

[¶5]   The following day, Dr. Peter Rork of Teton Orthopedics saw Mrs. Stevens, took x-rays, and performed surgery to repair her fractured hand.  Her pain assessment chart indicated pain in her left hand and arm only.  She was discharged with pain medication, and over the next several months, Mrs. Stevens returned to Dr. Rork to monitor the recovery of her hand.

[¶6]   Julie Huntley, PAC Director, met with Mrs. Stevens two days after the fall to fill out a Wyoming Report of Injury.  The report contains no indication that Mrs. Stevens injured her hip in the fall or was suffering from any hip pain at the time of the report.

1

[¶7]   On October 29, 2010, Mrs. Stevens returned to work for the PAC Halloween festivities.  At that time she felt soreness in her right hip, but she thought it would go away.

[¶8]   On November 2, 2010, Mrs. Stevens followed up with Dr. Rork.  Dr. Rork's notes from that visit indicate that her hand was healing well, and he would follow up with her in three weeks.  There is no mention of any other medical problems in Dr. Rork's notes.

[¶9]   On November 10, 2010, the Division issued its Final Determination of Compensability, in which it found Mrs. Stevens' hand injury compensable.

[¶10]  On November 29, 2010, Mrs. Stevens again followed up with Dr. Rork at Teton Orthopedics, who determined her hand was healing well.  At the conclusion of the visit with Dr. Rork, Mrs. Stevens mentioned for the first time the soreness in her right hip.  Dr. Rork thought she had developed bursitis in her right hip and prescribed an anti-inflammatory for relief.

[¶11]  Mrs. Stevens' next visit with Dr. Rork was on December 23, 2010.  At that time, Dr. Rork noted her hand wounds were clear, she was nontender, with increasing range of motion, and he would follow up in one month.  There is no mention of Mrs. Stevens' hip in Dr. Rork's record of the visit.

[¶12]  On January 13, 2011, approximately two and one-half months after her fall, Mrs. Stevens visited the Pinedale Medical Clinic, complaining of pain in her right hip.  During the visit, x-rays were taken of both her hips, and no abnormal findings were detected.  She was diagnosed with a possible tendon tear or bursitis in the right hip and scheduled for an MRI.

[¶13]  On January 17, 2011, Mrs. Stevens obtained an MRI of her hips.  The radiologist's interpretation of the MRI was as follows:

1.  Bilateral degenerative changes of the hips, right greater than left.
2.  Heterogeneous signal noted within femoral head and femoral neck. This most likely represents reactive stress edema; however, this could be a very atypical appearance of avascular necrosis.
3.  Edema within the obturator femoris muscle with probable tear of the superior fibers at the pubic ramus origin.
4.  Joint effusion.

That day, interpreting the results of the MRI, Dr. Rork diagnosed Mrs. Stevens with AVN in the femoral head of her right hip.  (AVN is the death of a bone due to lack of blood

2

supply.)  Dr. Rork noted, "This is probably a posttraumatic event related to the slip and fall accident of 10/26/10 [sic].  I am going to put her on crutches.  We will see her back for follow up in 6 weeks[.]"

[¶14]  At her February 28, 2011, follow-up, Dr. Rork's notes indicate, "[Mrs. Stevens] was complaining of hip pain that occurred at the time of the initial injury, this was probably overshadowed by the pain in her left hand.  What has occurred is that she has gone on to an AVN which may or may not require surgical intervention."

[¶15]  On April 25, 2011, another MRI was taken of Mrs. Stevens' hips.  The radiologist's report from this MRI provided the following interpretation:

> 1. The extent of marrow signal alteration on the right side is similar to the prior study although a more characteristic zone of signal alteration contained within a broader area of marrow edema in the right femoral head is more apparent.  These findings suggest the presence of avascular necrosis of the right femoral head.  There is evidence for arthritic change about the right hip joint and a hip effusion.
> 2. On the left hip, there is evidence for degenerative arthritic changes and evidence for a left hip effusion.  Signal alternations in the femoral head have progressed . . . since the prior study. . . .  Some component of avascular necrosis is possible although . . . signal changes of the avascular necrosis are more apparent on the right side than the left.  Again, however, signal alterations diffusely in the left femoral head have progressed since the prior exam.

[¶16]  Dr. Rork's April 25 notes indicate, "[Mrs. Stevens] states that her hip is feeling better."  However, regarding the MRI, Dr. Rork noted, "shows fracture of the femoral head [on right hip] with some mild degenerative changes in the left hip."  Dr. Rork decided to take her off the crutches and start her on water therapy.  Eventually, the femoral head on her right hip collapsed due to the AVN progression, and on December 14, 2011, Mrs. Stevens received a total right hip replacement.

[¶17]  On February 18 and March 1, 2011, the Division issued its Final Determinations, denying all payments for Mrs. Stevens' hip-related treatment based on the conclusion that "the right hip is not related to the original work injury to the left hand[.]"  Mrs. Stevens timely requested a contested case hearing, which was held December 7, 2012.[1]

---

[1] While an important function of the Medical Commission is to evaluate conflicting expert medical evidence, the record does not indicate that either the OAH or Mrs. Stevens sought to transfer the case to

3

[¶18] At the hearing, three of Mrs. Stevens' colleagues from the PAC testified on her behalf: Charlotte Keyser, Ellen Ramsey, and Julie Huntley. There were no eyewitnesses to Mrs. Stevens' fall and she could not remember exactly how she fell down the concrete stairs, other than she slipped, twisted or turned in the fall, and ended up with her left hand tangled up on the railing and her lower body straddling the last few steps. She crawled up the stairs, pushed the handicap button to open the doors, and crawled into the foyer of the PAC. Once inside, she began screaming for help, and the evening custodian, Charlotte Keyser, responded.

[¶19] Ms. Keyser found Mrs. Stevens lying in the fetal position in the PAC foyer crying for help. On direct examination at the contested case hearing, Ms. Keyser was asked to testify as to what Mrs. Stevens reported to her about the fall, to which she responded "Oh gosh, I don't remember." Later in her testimony, Ms. Keyser reported that Mrs. Stevens was clutching her wrist and also indicated that she hurt her right hip in the fall. Ms. Keyser further testified, "I was more concerned about her wrist, because that's what looked -- visually, that's where the problem was." After assisting Mrs. Stevens into a seated position inside the main area of the PAC, fellow PAC employees Sue Phlughoft[2] and Ellen Ramsey took over her care.

[¶20] Ellen Ramsey testified that she first saw Mrs. Stevens at a table in the PAC lobby shortly after she fell and she approached to see if she could help. Ms. Ramsey testified that she remembered Mrs. Stevens sitting on a table by the lobby doors, and "she was screaming in pain." In response to Ms. Phlughoft's question if she was hurt elsewhere, Ms. Ramsey remembered Mrs. Stevens telling Ms. Phlughoft that her hip was hurting and then making a head gesture toward her right side. On cross examination, Ms. Ramsey indicated that in a conversation two weeks after the fall, Mrs. Stevens talked about her wrist injury, did not talk about any hip pain, and was not limping. Ms. Ramsey did testify that approximately four weeks later Mrs. Stevens was limping and mentioned her hip pain to Ms. Ramsey in conversation.

[¶21] Julie Huntley recounted her interactions with Mrs. Stevens after the fall, specifically, meeting her two days later to fill out the Wyoming Report of Injury: "Oh, I just remember she said how sore she was, generally speaking, and that her hand was -- she definitely had a hand injury, and that she was sore everywhere. And beyond that, you know, I wouldn't be able to tell you." Ms. Huntley did testify that "somewhere in there within a couple of weeks" after Mrs. Stevens' fall, she observed her limping and told her

---

the Medical Commission. *See Russell v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 944 P.2d 1151, 1156 (Wyo. 1997); *see also* Wyo. Stat. Ann. § 27-14-616(e) (LexisNexis 2013) ("Upon agreement of all parties to a case, the hearing examiner in a contested case . . . may transfer a medically contested case to a medical hearing panel or may seek the advice of the medical commission on specific medical issues in the contested case.").

[2] Ms. Phlughoft did not testify at the contested case hearing.

to go get it checked out. The Wyoming Report of Injury contained no indication that Mrs. Stevens hurt her hip in the fall.

[¶22] Although the hearing examiner found each of these women credible, she stated in her Findings of Fact, Conclusions of Law, and Order, "suffice it to say that the Office finds and concludes that any statements or implications that Stevens had significant pain in the hip immediately after the fall are not supported."

[¶23] Mrs. Stevens testified about her fall and treatment to her wrist and hip. She indicated that her hip started to hurt immediately following the fall. However, the documentation of her fall and subsequent care did not indicate any hip pain until her first mention of hip pain to Dr. Rork on November 29, and her hip did not become the focus of her care until January 2011. From Mrs. Stevens' testimony, the hearing examiner found and concluded:

> 46. It is undisputed that Stevens denied any other injuries at the emergency room of the Pinedale Clinic. . . . The report does indicate obvious swelling, deformity and significant pain in Stevens' left hand. . . . On cross examination, when asked about the emergency room report, Stevens testified that she doesn't remember giving a history at the clinic but she gave an accurate history. She testified that she has worked in the medical field so she tries to remember her medical history so that she can help them and herself. Stevens again stated that she doesn't remember much about that night.

> . . . .

> 73. Overall Stevens' testimony was found to be credible. The evidence was undisputed that she had a fall and a significant injury to the hand that was her primary focus. . . . Her description of the impact to the hip or actual injury to her hip and the pain following the injury is somewhat suspect however given her lack of complaint at the emergency room and her lack of memory as to many of the other events occurring at the time. . . . The weight of the evidence also showed that at a minimum Stevens probably did suffer some injury to her hip at that time, but the Office was not convinced that there was in fact any subluxation of the hip as later suggested in the [medical expert] deposition testimony. . . . While the Office was persuaded that Stevens['] focus in the first few weeks was on her hand, the

5

Office also concludes that any injury to the hip that occurred during the fall was not significant enough at that time to draw anything other than a passing acknowledgement. Indeed Stevens herself later reported that she thought it was simply a bruise or strain and would go away. . . . Stevens['] testimony of a progressively worsening pain and the history reported in Dr. Rork's records, i.e., that it was tolerable and then became intolerable appears to be more accurate. As is set forth in more detail below this conclusion is used in weighing and evaluating the opinions of the medical experts.

[¶24] Mrs. Stevens offered the deposition of her treating physician, Dr. Rork, at the hearing. Summarizing the manifestation of her hip injury, he explained:

She didn't even mention it the first time she came in. And then about a month later she started mentioning it. And then as the pain didn't resolve, as a matter of fact worsened over time. And the natural history for something like an AVN is about three months after the incident, these patients are starting to develop significant discomfort. . . . And once I saw the AVN, I thought it was one of an acute nature, hadn't been there a long time.

When asked whether her slip and fall caused or aggravated some preexisting condition that caused AVN, Dr. Rork insisted: "I think this is a posttraumatic event. I think that her avascular necrosis occurred -- began with that fall." Explaining the basis for his opinion, Dr. Rork, testified:

She probably had a subluxation of her hip at the same time when she fell and broke her hand. She had an insidious onset of the avascular necrosis that resulted and went on to a collapse of the femoral head as a result of this. So -- and I draw that index event to be the slip and fall injury from October 2010.

[¶25] On cross examination, it was noted that Mrs. Stevens was seen at the Pinedale Clinic after the fall and denied any pain in the pelvic area. Dr. Rork agreed that this would be inconsistent with a person who had twisted the hip or had a trauma to their hip sufficient to cause AVN.

[¶26] Also under cross examination, Dr. Rork was asked about the presence of bilateral AVN and how that affected his opinion.

> Yeah. You know, it does throw a wrench into the works and raises a question, but [Dr. Newton is] looking at the radiologist's report. And, of course, you know, our joke in medicine is that the national flower for the radiologist is the hedge, that they always, you know, hedge their bets with their -- with their reading and they tend to be cautious in that respect. From my recollection of looking at the MRI, I don't think the left hip had anything going on at all, and -- but all the -- all the issues were in the right.

[¶27] The Division presented the medical report and deposition of Dr. Bruce Newton. At the Division's request, Dr. Newton performed an independent medical evaluation of Mrs. Stevens on September 27, 2011. Dr. Newton's report was comprehensive in scope and detail, including a review of Mrs. Stevens' medical history, a review of all records including x-rays and MRIs taken in the course of Mrs. Stevens' hand and hip treatment, as well as a physical examination of Mrs. Stevens. In his report, Dr. Newton concluded:

> I believe it is very unlikely that her right hip pathology is the direct result of the industrial injury of 10-25-10. Let me give the following rationale.
>
> A. There is no documented injury to the right hip from the fall of 4-25-10 [sic]. Retrospectively, Phylis reported hip pain ever since the injury. This was neither serious nor concerning until sometime between 12-22-10 and 1-13-11, so in other words, we do not have a reliable history of direct right hip injury.
>
> B. The onset for post-traumatic AVN was too early. Post-traumatic AVN typically develops at earliest six months after trauma, more likely 18 months. The development of symptomatic AVN within three months of a trauma is highly unlikely.
>
> C. Post-traumatic AVN does not follow a hip contusion. AVN of the hip can occur following serious trauma. The type of trauma that develops into AVN is femoral neck fracture or dislocation. Phylis's trauma to the hip, if any, (nothing was documented) would have been simply a hip contusion and certainly not the type of force that leads to avascular necrosis.

D.   The presence of bilateral avascular necrosis on MRI, i.e., stage one AVN on the left hand side essentially rules out the possibility of post-traumatic avascular necrosis to the right hip.

[¶28] In her final decision denying Mrs. Stevens' benefits for her hip, the hearing examiner concluded:

> 109.   Stevens argues that this case is similar to *Murray vs. State ex rel. Wyoming Workers' Compensation Division*, 1999 WY 184, 993 P.2d 327 (Wyo. 1999) in that the lack of prior symptoms and then the presence of symptoms after a work related incident establishes the causal connection.  The Office finds and concludes that Murray is distinguishable in that the injury in the Murray case occurred within 15 or 20 minutes of the work related incident.  The onset of Stevens['] hip injury, and specifically her AVN is not so clear cut.  Moreover, the Office finds and concludes that this case is more akin to *Langberg* [] *vs. State ex rel. Wyoming Workers' Compensation Division*, 2009 WY 39, 203 P.3d 1098 (Wyo. 2009) which involved a work related injury and a diagnosis of Kienbock's disease which also involves necrosis of the bone.  In that case the mere absence of evidence of disease prior to the work related injury and presence of the disease afterwards was not sufficient to establish the causal connection.
>
> 110.   Having reviewed the evidence and testimony in this case, the Office finds and concludes that while Stevens did suffer some injury to her hip as a result of the slip and fall, the Office was not persuaded that the injury suffered in the fall was anything more that [sic] a muscular injury or contusion.  More particularly the Office was not persuaded that Stevens suffered a subluxation or any other injury that caused her to then develop AVN. . . .  [H]er description of the actual injury to her hip and the pain immediately following the injury is somewhat suspect given her lack of complaint at that time and lack of memory as to many of the other events occurring at that time and in any event was not sufficient to establish the trauma necessary to cause AVN.
>
> . . . .

112. [I]n weighing the opinions of the experts, this Hearing Officer found that the opinions expressed by Dr. Newton were entitled to more weight. Dr. Newton and Dr. Rork have similar credentials. . . . Their credentials were not however the deciding factor. . . . Rather, Dr. Newton's opinions were stronger and reasons given for it appeared more logical.

113. The testimony of Dr. Rork appeared weaker and somewhat speculative. He appeared to make assumptions that there was a subluxation or a twisting type injury when asked whether the injuries were related to the fall. He did not address the direction of force needed for subluxation or the signs and symptoms of subluxation.

114. Dr. Newton on the other hand rendered a definitive opinion that addressed the direction of the force, the lack of signs or symptoms of subluxation, ie. [sic] immediate and extreme pain and inability to bear weight. Dr. Newton's opinion was based more on the evidence as opposed to Dr. Rork's opinion which was based upon assumptions.

115. As to the timing of onset of symptoms or diagnosis of AVN, even if the Office accepted Dr. Rork's opinion that the onset can occur in a shorter time frame, . . . the absence of symptoms at the time of injury would not necessarily indicate the absence of the disease process.

116. Finally with respect to the difference of opinions as to the presence of bilateral AVN, . . . Dr. Newton's opinion was deemed stronger and more persuasive. Dr. Rork just seemed to dismiss the finding out of hand, but did acknowledge that it "would throw a wrench in" his opinion if there was bilateral AVN.

117. Overall, the Office found that Dr. Newton's opinion was more thorough and had a stronger basis and that Dr. Rork's opinion was based upon assumptions. Therefore this Hearing Officer finds that Stevens has not proven by a preponderance of the evidence that she suffered an injury to her hip that led to the development of AVN while in the course and scope of her employment.

9

[¶29] Mrs. Stevens timely petitioned the Ninth Judicial District Court for review of the OAH decision to deny benefits. On November 26, 2013, the district court issued its decision affirming the OAH decision. This appeal followed.

## *DISCUSSION*

### I. *Was there substantial evidence to support the hearing examiner's determination that Mrs. Stevens' fall did not cause the avascular necrosis in her right hip?*

[¶30] On appeal from a district court's review of an administrative decision, we review the case as if it came directly from the administrative agency. *Hirsch v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 61, ¶ 33, 323 P.3d 1107, 1115 (Wyo. 2014) (citing *Birch v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 31, ¶ 12, 319 P.3d 901, 906 (Wyo. 2014)). Our review is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2013); we examine agency findings of fact by applying the substantial evidence standard. *Birch,* 2014 WY 31*,* ¶ 12, 319 P.3d at 906.

[¶31] Substantial evidence "means relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Green v. State ex rel. Dep't of Workforce Servs., Workers' Safety & Comp. Div.*, 2013 WY 81, ¶ 13, 304 P.3d 941, 946 (Wyo. 2013) (citing *Jacobs v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 8, 301 P.3d 137, 141 (Wyo. 2013)). "'Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.'" *Id*. (quoting *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011)). Whether we might reach the same result or not, we will not reweigh the evidence, but instead defer to the OAH's decision if it is based upon relevant evidence that a reasonable mind might accept. *See Torres v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 93, ¶ 24, 253 P.3d 175, 181 (Wyo. 2011).

[¶32] If an agency's decision determines that the claimant failed to meet her burden of proof, under our substantial evidence standard, "'this Court must decide whether [the] determination was contrary to the overwhelming weight of the evidence.'" *Hirsch*, 2014 WY 61, ¶ 34, 323 P.3d at 1115 (quoting *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 18, 307 P.3d 835, 840 (Wyo. 2013)). On review, the appellant has the burden of demonstrating that the findings of fact were not supported by substantial evidence. *Watkins v. State ex rel. Wyo. Med. Comm'n*, 2011 WY 49, ¶ 16, 250 P.3d 1082, 1086 (Wyo. 2011) (citing *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 475 (Wyo. 1996)).

[¶33] Mrs. Stevens argues that the hearing examiner's determination that her fall did not cause her AVN is contrary to the overwhelming weight of the evidence. She challenges

the hearing examiner's conclusion that the opinion of the Division's physician, Dr. Newton, was stronger and more persuasive than the opinion of her expert and treating physician, Dr. Rork. She argues that Dr. Newton's opinion that subluxation of her right hip did not occur is based on a misunderstanding of her fall; his opinion regarding the force and direction necessary for a subluxation of the hip was contradictory; and his opinion that Mrs. Stevens suffered bilateral AVN was not supported by substantial evidence.

[¶34] The Division asserts that Mrs. Stevens' and her co-workers' retrospective testimony indicating she immediately had pain in her hip following the fall is inconsistent with the medical documentation describing her injuries following the fall. In light of this inconsistency, the Division contends it was appropriate to weigh the conflicting opinions of the medical experts in this case in order to determine causation. On this front, the Division argues that Mrs. Stevens' medical expert presented speculative testimony which relied on assumption more than on the actual evidence. The Division supports the finding of the hearing examiner that Dr. Newton

> rendered a definitive opinion that addressed the direction of the force, the lack of signs or symptoms of subluxation, ie. [sic] immediate and extreme pain and the inability to bear weight. Dr. Newton's opinion was based more on the evidence as opposed to Dr. Rork's opinion which was based upon assumptions.

[¶35] A compensable injury is one "arising out of and in the course of employment[.]" Wyo. Stat. Ann. § 27-14-102(a)(xi) (LexisNexis 2013). In order to show that the compensable injury arises out of or in the course of employment, the workers' compensation claimant has the burden of proving each of the essential elements of the claim by a preponderance of the evidence, including a causal connection between the work-related incident and the injury. *Delacastro v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 40, ¶ 22, 321 P.3d 327, 333 (Wyo. 2014).

[¶36] The OAH hearing examiner was tasked with determining whether Mrs. Stevens' AVN, which ultimately resulted in replacement of her right hip, was caused by her October 2010 fall outside of the PAC.[3] To resolve the issue of causation, the hearing

---

[3] "Although pre-existing conditions are excluded from the definition of compensable injury by Wyo. Stat. Ann. § 27-14-102(a)(xi)(F) (LexisNexis 2013), an employee may recover if his employment has 'aggravated, accelerated, or combined with the disease or infirmity' to produce the condition for which compensation is sought." *Hayes v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 96, ¶ 14, 307 P.3d 843, 847 (Wyo. 2013) (citing *Dutcher v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 10, ¶ 14, 223 P.3d 559, 562 (Wyo. 2010)). Mrs. Stevens did not advance this preexisting causation theory, and the hearing examiner made note of this in her conclusions, "Neither medical expert provided an opinion that her AVN was preexisting . . . . Dr. Newton was not asked whether or not the work injury

examiner looked to the expert medical testimony presented by Mrs. Stevens and the Division. When presented with conflicting expert medical testimony, the hearing examiner determines the credibility and weight of the experts' opinions.

> The finder of fact is not necessarily bound by the expert medical testimony . . . . It is the hearing examiner's responsibility, as the trier of fact, to determine the relevancy, assign probative value and ascribe the relevant weight given to medical testimony. The hearing examiner is also in the best position to judge the weight to be given to the medical evidence. The trier of fact may disregard an expert opinion if he finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based.

*Little v. State ex rel. Dep't of Workforce Servs.,* 2013 WY 100, ¶ 37, 308 P.3d 832, 843 (Wyo. 2013) (citations omitted).

[¶37] Mrs. Stevens' claim that the hearing examiner's decision was not supported by substantial evidence is based on the assertion that the hearing examiner did not properly weigh the expert testimony presented at the contested case hearing. She argues that Dr. Newton's determination that her hip did not sublux[4] was improperly based on his misunderstanding of Mrs. Stevens' fall.

[¶38] We agree that Dr. Newton's testimony on the mechanism of the fall was equivocal. However, regardless of disagreement over whether a posterior- or anterior-forced subluxation is sufficient to cause AVN, Dr. Newton's testimony did indicate that trauma-induced AVN is usually caused by a significant injury such as a femoral neck fracture or dislocation of the hip joint. He concluded that in the absence of any immediately documented reports of such a significant injury, or imaging data indicating a femoral neck fracture or dislocation to Mrs. Stevens' right hip from the fall, she did not sustain the force sufficient for trauma-induced AVN.

[¶39] Mrs. Stevens argues that Dr. Newton's misunderstanding of the fall and his opinion drawn therefrom contradicts the overwhelming weight of evidence presented at the hearing. She argues that her testimony at the hearing "clearly showed" that she had not simply fallen on her buttocks, but fell down a flight of concrete steps, "going forward

---

caused a 'material or substantial aggravation' of Stevens' AVN. Nor did Dr. Rork testify to any aggravation as in his opinion the fall was the cause of the AVN." Accordingly, we will not address whether Mrs. Stevens' AVN was a pre-existing condition aggravated by her work injury.

[4] Mrs. Stevens also argues that Dr. Newton did not understand the term "subluxation" due to his recanting a previous position statement that "the hip does not sublux." This appeared to be more a question of semantics than a misunderstanding of what a subluxation is. Both parties seemed to agree that subluxation is a temporary, partial dislocation of the hip joint.

and down the stairs, twisting and turning as she fell, eventually landing on her right hip with her right knee jammed into the bottom steps." She argues that her physician, Dr. Rork, had a clear understanding of how she fell, and that his understanding fits his theory that she subluxed her hip.

[¶40] Having reviewed the record, we cannot find any evidence that Mrs. Stevens fell forward in her fall down the steps. At the hearing, Mrs. Stevens testified:

> I lifted my left foot, and as I lifted my left foot, my body just went. And the next thing I knew, twisting or turning, I landed down here with my hand -- it seemed like my hand was up here on this bar, and my legs were down here [referencing photo exhibit of stairs].

[¶41] Mrs. Stevens' own treating physician appeared not entirely clear on the mechanism of Mrs. Stevens' fall: "You know, I don't recall the mechanism of action." Instead, Dr. Rork used the case of pro athlete Bo Jackson to analogize Mrs. Stevens' hip injury. Dr. Rork stated, "they theorize" that he "probably had a transient subluxation of the hip" that caused him to develop AVN. Dr. Rork indicated that the deep bruise on Mrs. Stevens' right hip and the initial findings on the MRI were "consistent with a mild subluxation such as Bo Jackson." Regarding Dr. Rork's use of Bo Jackson's injury, the hearing examiner found, "this . . . seemed to then become the focus of the case. Indeed it appeared to be the only mechanism of injury that would provide the causal connection to the work related injury." The hearing examiner concluded:

> 113. The testimony of Dr. Rork appeared weaker and somewhat speculative. He appeared to make assumptions that there was a subluxation or a twisting type of injury when asked whether the injuries were related to the fall.

"If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test." *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008).

[¶42] Mrs. Stevens' lack of clarity and Dr. Rork's conjecture hardly paint a clear picture of the type of fall suffered by Mrs. Stevens. While Dr. Newton's understanding of Mrs. Stevens' fall may not be complete, his explanation of the significant amount of force necessary to cause AVN is compelling regardless of how Mrs. Stevens fell. Dr. Newton reiterated several times in his deposition testimony that trauma-induced AVN would require a significant force, which in turn would likely register as a serious, immediately reportable, injury to the patient. The hearing examiner's determination that the facts did

not support a finding of the severe hip injury required to cause trauma-induced AVN is supported by substantial evidence.

[¶43] Dr. Newton provided two additional reasons[5] why the fall did not cause Mrs. Stevens' AVN. He opined that the time of onset of Mrs. Stevens' AVN was not consistent with trauma-induced AVN. Mrs. Stevens' medical records indicate that her hip pain did not reach a reportable level until one month after her fall, and she was diagnosed with AVN three months after the fall, which Dr. Newton testified, "is exceptionally fast for the development of AVN following trauma." Dr. Newton relied on a peer-reviewed article which examined the onset of symptoms and diagnoses of 146 patients who actually fractured or dislocated their hip, "a population where you're actually looking for [trauma-induced AVN]." Dr. Newton reported that even in this population, the range of onset of symptoms of AVN ranged from 3 to 47 months, and the average time of diagnosis was 18.8 months. Mrs. Stevens' onset of symptoms, as well as her AVN diagnosis within three months of the fall, are statistically inconsistent with the data presented by Dr. Newton.

[¶44] Finally, Dr. Newton considered the fact that Mrs. Stevens' April MRI revealed bilateral AVN, "which would not occur with an injury to -- to a right hip. You wouldn't have AVN on the left side as a result of that." In other words, trauma-induced AVN to the right hip would not explain AVN in the left hip.

[¶45] On this final point, Mrs. Stevens argues that "for over two years after the original fall, Mrs. Stevens did not have any problems with her left hip up to the date of hearing date [sic] on December 7, 2012; ruling out AVN was a systemic condition." While the hearing examiner did not address this in her final determination, Dr. Newton testified:

> A: AVN can stay quiescent for a long time. If it were degenerative change, we'd expect the same thing. We'd expect her to have increasing symptoms. So in either case, either arthritis or AVN, it would be unusual for her not to develop eventual symptoms in that left side.
>
> Q: All right. But if onset is 18 months, looking at it, I mean, it's kind of unusual not to have two years symptom free if it's a systemic event?

---

[5] Dr. Newton enumerated four bases supporting his conclusion that Mrs. Stevens' AVN was not trauma induced: 1) no immediate, documented pain; 2) the AVN developed too quickly for traumatic AVN; 3) she did not suffer from a fracture or dislocation typical of AVN; and 4) a traumatic injury to one hip causing bilateral systemic AVN is improbable. Through the course of his testimony, he tended to lump bases one and three together, explaining that trauma-induced AVN usually results from a fracture or dislocation, which in turn would be immediately reportable.

14

> A: Oh, no. It's very, very common. But that's because this would not be considered traumatic AVN. So in -- in patients that have idiopathic AVN, it can stay quiescent for a long time.

Dr. Newton's explanation of Mrs. Stevens' bilateral AVN is well-reasoned and fits within the earlier explanations he gave regarding the onset of trauma-induced AVN. On the other hand, Dr. Rork simply dismissed the fact that Mrs. Stevens' April MRI revealed bilateral AVN, but did acknowledge that it "would throw a wrench in" his opinion if there was bilateral AVN.

[¶46] Mrs. Stevens has failed to establish that the hearing examiner's deference to Dr. Newton's expert opinion was contrary to the overwhelming weight of evidence. While Mrs. Stevens' expert medical testimony was speculative in nature, Dr. Newton provided articulate explanations for his opinion based on a comprehensive review of Mrs. Stevens' complete medical history as well as a physical exam of Mrs. Stevens. The hearing examiner considered both expert opinions, explained the weaknesses in Dr. Rork's speculative testimony, and ultimately found the weight of Dr. Newton's opinion most persuasive. We conclude that the hearing examiner, as trier of fact, could reasonably conclude as she did, based on all the evidence before her. Accordingly, there was substantial evidence to support the hearing examiner's final determinations.

## II. The hearing examiner concluded that the absence of evidence of disease prior to the work-related injury and the presence of the disease afterwards was not sufficient to establish a causal link. Was that conclusion in accordance with the law?

[¶47] We review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law. Wyo. Stat. Ann. § 16-3-114(c); *Kenyon*, 2011 WY 14, ¶ 13, 247 P.3d at 849. When reviewing a mixed question of law and fact, we separate the factual and legal aspects of the hearing examiner's decision to determine whether the correct rule of law has been properly applied to the facts. *City of Casper v. Haines*, 886 P.2d 585, 587 (Wyo. 1994) (citing *Aanenson v. State ex rel. Wyo. Workers' Comp. Div.*, 842 P.2d 1077, 1079-80 (Wyo. 1992)).

[¶48] Mrs. Stevens argues that the hearing examiner erred as a matter of law by failing to apply the holding of *Murray v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 993 P.2d 327 (Wyo. 1999) to the facts of her case. She contends that, under *Murray*, her good health prior to the fall and the changes afterward are sufficient to find a causal connection between the fall and her right hip AVN, even when there is conflicting expert medical testimony regarding causation.

15

[¶49] In *Murray*, the claimant was working as a plant operator at a gas processing plant. 993 P.2d at 328. Murray drew a routine sample of raw gas and approximately 15 to 20 minutes later, he suffered an outbreak of a severe rash on his wrists. *Id*. Murray was eventually diagnosed with urticaria, but when his doctor attempted more allergy tests to determine the specific cause, Murray suffered severe, life-threatening allergic reactions. *Id*. at 329. The severity of these reactions prevented further testing, and left the determination of the cause of his urticaria inconclusive. *Id*. The Division denied his claim for benefits. *Id*.

[¶50] At the contested case hearing, Murray's treating physician opined that exposure to chemicals in his gloves at work likely caused his rash. *Id*. at 331. The Division's doctor "did not disagree, but stated that he could not offer the same opinion to a reasonable degree of medical certainty due to the limitations of the present science in identifying a specific cause." *Id*. at 332.[6] Both doctors agreed that "something happened," but that the tests for causation were inconclusive. *Id*. Lacking proof of causation, the hearing officer denied benefits to Murray.

[¶51] On appeal, we held that "proof of prior good health and change immediately following and continuing after an injury may establish that an impaired condition was due to the injury." *Id*. (citing *Waldorf Corp. v. Industrial Comm'n*, 708 N.E.2d 476, 480 (Ill. App. Ct. 1999)). We further stated:

> [E]vidence of the timing of symptoms has been specifically recognized as a competent way of studying causation; the manner in which the disease developed, with reference to the claimant's medical and work history is entirely appropriate for the court to consider. Indeed, we have recognized that when a single incident injury is so [immediate] and directly or naturally and probably the result of an accident, . . . medical evidence is not essential to find a causal connection.

*Id*. (internal citations and quotation marks omitted).

---

[6] We have clarified that the standard to establish causation in workers' compensation cases is a reasonable degree of medical probability:

> [T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection.

*Trump v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 140, ¶ 22, 312 P.3d 802, 809 (Wyo. 2013) (quoting *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005)).

[¶52]  Murray presented uncontradicted evidence that his injury occurred while he was at work, and that it was triggered when he collected the sample of raw gas.  Murray's treating physician and the Division's expert agreed that "something happened" at work, the onset of his symptoms was immediate, the causation tests were inconclusive, and further testing would be dangerous to Murray.  While Murray's treating physician testified that the urticaria was caused by something in Murray's gloves, the Division's expert did not disagree but refused to offer a similar opinion to a reasonable degree of medical certainty due to the limitations of science in identifying specific causes to urticaria.  *Id*. at 333.  Considering the uncontradicted evidence, the immediacy of the onset of symptoms, and the limitations of science, we reversed in favor of Murray.

[¶53]  We recognized in *Murray* that, in certain circumstances, the temporal connection between a work-related incident and an adverse change in health can be "a competent way of studying causation."  *Id*. at 332.  We did not hold that such a temporal relationship will necessarily be sufficient to establish causation.  In fact, in *Murray* we cautioned, "where a medical question is complex, and the fact finding must be done in a realm that appropriately relies upon technical medical knowledge and expertise, medical testimony should not be ignored."  *Id*. (quoting *Forni v. Pathfinder Mines*, 834 P.2d 688, 693 (Wyo. 1992)).

[¶54]  Here, the circumstances are more complex than in *Murray*.  The two experts disagreed regarding the cause of Mrs. Stevens' AVN.  Mrs. Stevens made no documented report of her hip problems for over a month after her fall, and did not seek treatment for more than two months after the fall.  While her co-workers testified that Mrs. Stevens immediately indicated pain in her hip following the injury, this testimony conflicted with the absence of documentation of any hip pain.  Thus, the hearing examiner gave little weight to their testimony regarding the immediate onset of hip pain following Mrs. Stevens' fall.  "'Credibility determinations are the unique province of the hearing examiner, and we eschew re-weighing those conclusions.'"  *Willey v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 144, ¶ 20, 288 P.3d 418, 427 (Wyo. 2012) (quoting *Beall v. Sky Blue Enters., Inc.*, 2012 WY 38, ¶ 28, 271 P.3d 1022, 1034 (Wyo. 2012)).  Considering the conflicting expert opinions regarding causation and the equivocal evidence of immediate onset of pain, we find Mrs. Stevens' case is materially different than *Murray*.

[¶55]  The hearing examiner was not persuaded that *Murray* should apply to Mrs. Stevens' case, concluding "that Murray is distinguishable in that the injury in the Murray case occurred within 15 or 20 minutes of the work related incident.  The onset of Stevens['] hip injury, and specifically her AVN is not so clear cut."  We agree with the hearing examiner that Mrs. Stevens' fall and the onset of her AVN are "not so clear cut."

[¶56]  Because of the complexity of the onset of Mrs. Stevens' AVN, we find *Langberg v. State ex rel. Wyoming Workers' Safety & Compensation Division*, 2009 WY 39, 203 P.3d 1098 (Wyo. 2009) is more applicable.  In that case, the claimant injured his left wrist while at work.  *Id*. at ¶ 3, 203 P.3d at 1100.  Four months later, he re-injured the same wrist. *Id*. at ¶ 4, 203 P.3d at 1100.  He was diagnosed with Kienbock's disease, and eventually underwent surgery because he was developing avascular necrosis due to the Kienbock's disease.  *Id*. at ¶ 7, 203 P.3d at 1100.  Langberg's claim was denied by the Division based on lack of proof of causation.  He contested this determination, asserting that his Kienbock's disease was caused by a "single traumatic injury," *Id*. at ¶ 11, 203 P.3d at 1101, and that proof of lack of medical problems before a work injury and change immediately following the injury was sufficient to prove causation.  *Id*. at ¶ 12, 203 P.3d at 1101.  However, Langberg's treating physician's deposition testimony "explained the cause of Kienbock's disease is unknown," and that he "found no significance in the fact that Langberg had no wrist problems prior to his work injuries."  *Id*. at ¶¶ 13-14, 203 P.3d at 1101-02.

[¶57]  On appeal we concluded that "[t]he flaw in Langberg's reasoning is that [his own treating physician], an expert in the field and intimately familiar with Langberg's medical condition, effectively testified that Langberg's theory is pure speculation."  *Id*. at ¶ 16, 203 P.3d at 1102.

[¶58]  *Langberg* establishes that a claimant's lack of symptoms, followed by a work incident, followed sometime later by symptoms, does not always meet a claimant's causation burden.  *See Hayes v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 96, ¶ 21, 307 P.3d 843, 850 (Wyo. 2013) (citing *Jacobs*, 2013 WY 62, ¶¶ 19-25, 301 P.3d at 145-48) ("[T]he temporal relationship between [claimant's] pain and the workplace injury, i.e., his pain started when antibiotics were used to treat the infection from his work injury, was insufficient to establish a causal link.").

[¶59]  *Langberg* also stands for the proposition that a hearing examiner may rely on expert medical testimony regarding causation to negate a claimant's speculative theory of causation.  *Id.* at ¶ 21, 307 P.3d at 850.  In Mrs. Stevens' case, the hearing examiner relied on Dr. Newton's expert medical testimony rather than the speculative post-traumatic theory provided by Mrs. Stevens and her own expert, Dr. Rork.  The hearing examiner relied on Dr. Newton's four bases for concluding Mrs. Stevens' AVN was not caused by her fall at work: 1) no immediate, documented pain; 2) the AVN developed too quickly for traumatic AVN; 3) she did not suffer from a fracture or dislocation typical of AVN; and 4) a traumatic injury to one hip causing bilateral systemic AVN is improbable.  Dr. Rork only speculated that Stevens had suffered some sort of subluxation resulting in AVN while Dr. Newton provided comprehensive evidence to a reasonable degree of medical probability that Mrs. Stevens' fall did not cause her AVN.  "[S]peculative medical testimony is insufficient to satisfy a claimant's burden of proof."  *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 21, 120 P.3d 658, 666 (Wyo. 2005) (citing

18

*Frazier v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 997 P.2d 487, 490 (Wyo. 2000)); *see also Corman v. State ex rel. Wyo. Workers' Comp. Div.*, 909 P.2d 966, 972 (Wyo. 1996) ("A claimant cannot prevail if factors necessary to prove his claim are left to conjecture.").

[¶60] Our conclusion in *Langberg* that the mere absence of evidence of disease prior to the work-related injury and the presence of the disease afterwards was not sufficient to establish the causal link, is equally applicable to Mrs. Stevens' case, and we find no error in the hearing officer's conclusions of law. *See Langberg*, 2009 WY 39, ¶ 12, 203 P.3d at 1101.

## *CONCLUSION*

[¶61] The OAH's findings of fact and conclusions of law are supported by substantial evidence and are in accordance with the law. Therefore, we affirm the district court's order which affirmed the OAH's findings and conclusions.