# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 130

### APRIL TERM, A.D. 2015

### September 23, 2015

IN THE MATTER OF THE WORKER'S
COMPENSATION BENEFITS
CLAIMED BY SHAREN SCHERF,
SURVIVING SPOUSE OF ROBERT A.
SCHERF, DECEASED EMPLOYEE OF
MOUNTAIN CONSTRUCTION
COMPANY:

SHAREN SCHERF,

Appellant
(Petitioner),                                    S-15-0015

v.

STATE OF WYOMING, ex rel.,
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Big Horn County*
*The Honorable Robert E. Skar, Judge*

*Representing Appellant:*
> Sky D Phifer of Phifer Law Office, Lander, WY.

*Representing Appellees:*
> Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; and Samantha Caselli, Assistant Attorney General.

*Before BURKE, C.J., and HILL, \*KITE, DAVIS, and FOX, JJ.*

\* Justice Kite retired from judicial office effective August 3, 2015, and pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015) she was reassigned to act on this matter on August 4, 2015.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]     Robert Scherf died from a heart attack he suffered at work while servicing a front end loader.  His widow Sharen Scherf (Claimant) applied for worker's compensation death benefits, and those benefits were denied.  The Office of Administrative Hearings (OAH) upheld the denial of benefits, finding that although the Claimant had proved the required causal link between the work exertion and the heart attack, she had failed to prove that the exertion itself was unusual or abnormal for an employee servicing heavy equipment.  The district court affirmed, and this appeal followed.  We find the OAH order to be unsupported by substantial evidence and reverse and remand for entry of an order awarding benefits.

## ISSUES

[¶2]     Claimant presents two issues on appeal, which she states as follows:

> 1.      Was the denial of death benefits for the Claimant as a result of the death of her husband from a coronary condition arbitrary, capricious, an abuse of discretion or contrary to law?
> 2.      Was the denial of death benefits for the Claimant as a result of the death of her husband from a coronary unsupported by substantial evidence?

## FACTS

[¶3]     Robert Scherf began working for Mountain Construction Company shortly after the company was formed in 1999 or 2000.  Mountain Construction does road construction, primarily highway paving and crushing, throughout Wyoming.  During his employment with Mountain Construction, Mr. Scherf worked in a number of positions, including as a truck driver, loader operator, and oiler.  Mike Frost, president of Mountain Construction and one of its co-owners, described Mr. Scherf as one of the company's better hands.

[¶4]     Although Mike Frost considered Mr. Scherf one of the company's better hands, Mountain Construction, on June 3, 2011, fired Mr. Scherf.  At that time, Mr. Scherf was working as a truck driver and had had a couple of mishaps, first pulling a truck loaded with asphalt into a ditch where it became stuck and shortly thereafter failing to open the tarps on a truck before the truck was reloaded.  Nearly immediately after the company fired Mr. Scherf, Mike Frost offered to rehire Mr. Scherf in the position of oiler, which is the position responsible for maintaining the heavy equipment, including fueling the equipment every night, changing oil as needed, greasing equipment, and changing air filters.

1

[¶5]   Mr. Scherf accepted the position of oiler but requested some time off before beginning work as an oiler.  In making that request, Mr. Scherf told Mr. Frost that he had not been feeling well, and he felt that this was the reason for his mistakes.  Mike Frost told him it was fine to take the time he needed to heal.  Mr. Scherf then began work as an oiler on Monday, June 13, 2011, at a jobsite outside Greybull, Wyoming.

[¶6]   When Mr. Scherf was out of town for work, it was his routine to talk at least daily with his wife (Claimant), who was home in Lander, Wyoming.  In keeping with that routine, Mr. Scherf called Claimant after he completed work on Thursday, June 16, 2011.  Claimant described that conversation:

> A.     * * * Then he called me that Thursday, and told me that he had pulled some rib muscles.  He told me that this loader he was servicing was really hard to get the panel out and put it back in.  He said, I pulled some rib muscles.
> Q.     Did he say why it was really hard to pull out?
> A.     He said it was just really crusted up with mud and stuff.
> Q.     Did he tell you anything else about what he felt at the time that he was doing this?  You said he felt like he pulled some ribs.  Did he tell you how else it felt?
> A.     He said, I feel very nauseated and light-headed.
> Q.     Had he ever pulled ribs before?
> A.     Yes.
> Q.     And had he ever had a heart attack before?
> A.     No.
> Q.     So what did he tell you that he did then?
> A.     He said that Stu Eckhart drove in, and he had gone to Stu and asked him if he wanted him to service his vehicle.  He said, well, you might as well, so he did that.  Then he got in his truck and he left.  He said that he felt nauseated and light-headed and he stopped on the side of the road.
> Stu had started – when he seen Bob, Bob just stuck his hand out the window and told him to go on because he could see it was Stu.  He stopped about two or three times he said, and then he got to the camper.
> Q.     Going back to when he was working on the loader and he had to open up the panel, did he say how much exertion – how hard it was?

2

> A. It was very hard, he said, to get that out, and then he said, but mostly shoving it back in. He said that's when the pain came, when he was getting it back in.

[¶7] Claimant called Mr. Scherf the following morning, and he told her that he did not feel well and was not going to work that morning. Claimant stated he was not very coherent and hung up on her. Claimant then contacted a co-worker, who sent his daughter and grandson to check on Mr. Scherf. Mr. Scherf told them he just needed to sleep and asked that they leave. Claimant then contacted Mike Frost and asked him to check on her husband. Mr. Frost called Mr. Scherf, who told him he thought he had pulled a muscle in his chest or back and "that if everybody would just leave him alone, he could get some rest and he would be fine." Mr. Frost remained concerned so he visited Mr. Scherf in person. Mr. Frost found that Mr. Scherf looked tired and sick and did not make much sense. Mr. Frost suspected a heart attack and called an ambulance.

[¶8] Mr. Scherf was taken by ambulance to the hospital in Powell, Wyoming, where he was diagnosed with an "Acute ST elevation myocardial infarction." He was then transferred to Wyoming Medical Center in Casper, Wyoming. Mr. Scherf was treated without success at Wyoming Medical Center and died at 11:36 p.m. the evening of June 17, 2011. The cause of death was acute myocardial infarction with cardiogenic shock.

[¶9] On February 3, 2012, Claimant submitted an injury report to the Wyoming Workers' Safety and Compensation Division (Division). On March 5, 2012, the Division issued a final determination denying benefits on the grounds that the myocardial infarction was not a compensable injury and there was no indication that the work being performed by Mr. Scherf when he suffered his attack was unusual or abnormal for his job. Claimant objected, and the matter was referred to the OAH for hearing.

[¶10] In support of her claim that the work Mr. Scherf was performing when he had a heart attack directly caused the attack, Claimant submitted the expert opinion of cardiologist, John Rudoff, MD. Dr. Rudoff opined[1]:

> Mr. Robert Scherf was an approximately 68-year-old man, a long-time smoker, with chronic hypertension, hyperlipidemia, and renal insufficiency. Approximately 8:30 p.m. on June 16, 2011, while doing heavy physical work for his employer, consisting of straining to open and shut an access panel while doing maintenance on a 980G Loader, he suddenly felt the abrupt onset of pain shooting through his chest. He managed

---

[1] We note that Dr. Rudoff's opinion indicates that Mr. Scherf suffered his heart attack while at work at 8:30 p.m. This is accurate. Oilers begin and end their work days later than the drivers/operators because they service the equipment after its use at the worksite.

to finish that work activity and a subsequent work activity. He was noted to be moving slowly.

The following morning, when his wife was unable to reach him by telephone, she called his place of employment and asked them to investigate. He was subsequently brought to Powell Valley Medical Center where he was found to be having a myocardial infarction.

He was immediately transferred by Life Flight to the Wyoming Medical Center, where he almost immediately had a syncopal event requiring cardiac resuscitation. At that time he was in cardiogenic shock and he was taken for emergency cardiac catheterization. The cardiac catheterization was done with considerable difficulty under emergency circumstances. Consideration was given to use of a balloon pump, but this could not be placed because of a large abdominal aortic aneurysm (which had not ruptured). The proximal left anterior descending coronary artery was chronically occluded with right to left collateral flow. The interventional cardiologist was able only to open one diagonal branch. After the procedure he was returned to the intensive care unit, where he subsequently died from cardiogenic shock.

There is no reasonable doubt that this patient died of an acute myocardial infarction. This is based on the presentation of his symptoms, the electrocardiograms, the troponin abnormalities, the findings at angiography, his hemodynamics, and his ultimate outcome. This is all mainstream cardiology, and is a well described and well understood course of acute myocardial infarction with cardiogenic shock. The mortality rate of cardiogenic shock is extremely severe, and even in the best of circumstances approaches 50%.

There is also no reasonable doubt that this myocardial infarction began while he was at work on June 16, 2011. Based upon the information presented in a narrative and also in the admitting dictation from Powell Valley Health Care, his presentation of an acute myocardial infarction was completely typical. This includes the acute onset of substernal chest pain described as beginning approximately 8:30 p.m., with radiation into the right arm as far as the

4

elbow.  Associated symptoms included diaphoresis, dizziness, and nausea.  This is indeed a perfectly typical presentation of a myocardial infarction.  This is particularly evident in the setting of his being a high risk individual, with ongoing heavy smoking, hypertension, and hyperlipidemia.

Furthermore, it is also my considered opinion, based upon my experience as a cardiologist with approximately 25 years' experience with many cases of acute myocardial infarction, that there was a direct material causal connection between the immediate phase of his heavy work and the onset of his acute myocardial infarction.  The precise mechanism of this is presumed to be, with probably 90% likelihood, acute rupture of a non-occlusive plaque in the diagonal branch of the anterior descending.  This was precipitated here by sudden exertion that was more severe than usual.  The reason for the assertion of 90% likelihood is that at least that percentage of acute myocardial infarctions is caused by an acute plaque rupture.

While it is clearly true that the majority of myocardial infarctions begin at rest, that is because people generally spend more time at rest than they do in acute strenuous exertion.  The mechanisms and triggers of plaque rupture are complicated and multifactorial.  These generally include a combination of humoral factors such as adrenaline release, inflammation, and dynamic blood vessel tone; and also include mechanical factors such as shear forces, blood viscosity, and the degree of underlying arterial narrowing.
It is quite clear, and in keeping with mainstream cardiology thinking, that in this vulnerable individual, the abrupt effort of attempting to make a repair on the equipment he was working on materially contributed to most of those factors, both mechanical and humoral.

This is very similar to the well-known "snow shoveling myocardial infarction" which has been described for many decades in cardiology.  A previously asymptomatic individual does unusually heavy exertion, and abruptly develops symptoms and findings consistent with acute myocardial infarction.  It is unfortunately the case that the most common underline presentation of coronary artery disease is either sudden

cardiac death or acute myocardial infarction, as it was in this case.

[¶11] The OAH accepted Dr. Rudoff's opinion that there was a direct causal link between Mr. Scherf's work and his myocardial infarction. The OAH rejected the claim for benefits, however, on the ground that Claimant had not met her burden of showing that the employment stress that led to the myocardial infarction was unusual to or abnormal for the particular employment in which Mr. Scherf was engaged. The OAH concluded:

> 9. By way of the competent medical evidence provided by Dr. Rudoff, together with the other evidence produced, the Office is convinced that there was a direct causal connection between the condition under which Mr. Scherf was performing the maintenance of the loader on June 16, 2011, and the myocardial infarction in that the acute symptoms of the condition were clearly manifested not later than four hours after that causative exertion. W.S. § 27-14-603(b)(i) and (iii).
>
> 10. Claimant also has the burden to demonstrate that the causative exertion occurred during a period of time that the stress was clearly unusual to or abnormal for employees in that particular employment, irrespective of whether the employment stress was unusual to or abnormal for that particular employee. W.S. § 27-14-603(b)(ii). This has been identified by the Wyoming Supreme Court as an objective test which requires examination more of the job rather than the individual performing the job. *Loomer v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2004 WY 47, ¶ 22, 88 P.3d 1036, 1043 (Wyo. 2004).
>
> 11. Claimant's "particular employment" at the time of his cardiac event was that of oiler, or one who performs routine maintenance on, among other things, the 980G loader. Claimant argues that her husband was performing routine maintenance but that the conditions were not routine, in that the equipment was covered with mud which required an additional exertion on his part. If the paving operation was up and going, as it was on June 16, 2011, the equipment must be maintained, regardless of the muddy equipment.
>
> 12. Dr. Rudoff testified that there was a sudden exertion more severe than usual, and this has to be based upon the statement forwarded to him by Claimant's counsel which again reiterated the discussion by and between

Claimant and her husband on the night of the 16th regarding the condition of the loader that day (encrusted with mud). The Office is not convinced, however, that the cardiologist demonstrated the appropriate foundation for this opinion or otherwise expressed a sound understanding of what it was that oilers or heavy equipment operators do in order to give a legitimate opinion that Mr. Scherf exerted himself in a more severe than usual manner than oilers generally experience.

13.     Even if Mr. Scherf had to exert himself more than usual in opening and closing the panel to access the loader's engine oil on the day in question, while it may have been an employment stress unusual or abnormal for him, the Office is not convinced that it was clearly unusual or abnormal for oilers in this industry. This is the reason why Claimant's claim must fail.

14.     The Office does not base its decision in any way upon the fact that Claimant had numerous cardiac risk factors at the time of his heart attack. The decision is based upon the fact that Claimant was doing nothing unusual or abnormal for an oiler when the heart attack occurred.

[¶12] Claimant appealed the OAH decision to the district court, and the district court affirmed. Claimant thereafter timely filed her notice of appeal to this Court.

## STANDARD OF REVIEW

[¶13] This Court reviews a district court's decision on an administrative decision as though the case came directly from the administrative agency. *Stevens v. State ex rel. Dep't of Workforce Servs., Workers' Safety & Comp. Div.*, 2014 WY 153, ¶ 30, 338 P.3d 921, 928 (Wyo. 2014) (citing *Hirsch v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 61, ¶ 33, 323 P.3d 1107, 1115 (Wyo. 2014)). Our review is governed by the Wyoming Administrative Procedure Act, which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or

7

unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2015).

[¶14] Under the Wyoming Administrative Procedure Act, we review an agency's findings of fact by applying the substantial evidence standard. *Jacobs v. State ex. rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 62, ¶ 8, 301 P.3d 137, 140-41 (Wyo. 2013); *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence means relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Jacobs*, ¶ 8, 301 P.3d at 141; *Bush v. State ex rel. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005). "'Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.'" *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo. 2011) (quoting *Bush*, ¶ 5, 120 P.3d at 179).

[¶15] Under the substantial evidence standard, a hearing examiner has wide latitude to "determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented," including medical evidence and opinion. *Spletzer v. Wyo. ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo. 2005) (citing *Clark v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 934 P.2d 1269, 1271 (Wyo. 1997)). This Court will only overturn a hearing examiner's determinations if they are "clearly contrary to the great weight of the evidence." *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 16, 123 P.3d 143, 148 (Wyo. 2005) (quoting *Hurley v. PDQ Transp., Inc.*, 6 P.3d 134, 138 (Wyo. 2000)). We recognize that a hearing examiner may disregard evidence found to be "evasive, equivocal, confused, or otherwise uncertain." *Id.* (quoting *Krause v. State ex rel. Wyo. Workers' Comp. Div.*, 803 P.2d 81, 83 (Wyo. 1990)). "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its

8

decision will be sustainable under the substantial evidence test." *Dale*, 2008 WY 84, ¶ 22, 188 P.3d at 561.

[¶16] Regarding a determination that claimant did not meet his or her burden of proof, we have stated:

> If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. * * * Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Workers' Comp. Claim of Vernon Bailey v. Wyo. ex rel. Dep't of Workforce Servs.,* 2015 WY 20, ¶ 11, 342 P.3d 1210, 1213 (Wyo. 2015) (quoting *Dale*, ¶ 22, 188 P.3d at 561).

[¶17] The arbitrary and capricious standard of review is used as a "safety net" to catch agency action that prejudices a party's substantial rights or is contrary to the other review standards, but is not easily categorized to a particular standard. *Jacobs*, ¶ 9, 301 P.3d at 141. "The arbitrary and capricious standard applies if the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Id.* "'We review an agency's conclusions of law *de novo,* and will affirm only if the agency's conclusions are in accordance with the law.'" *Kenyon*, ¶ 13, 247 P.3d at 849 (quoting *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo. 2010)).

## DISCUSSION

[¶18] Work related coronary injuries or conditions are compensable if certain statutory conditions are met:

> Benefits for employment-related coronary conditions except those directly and solely caused by an injury, are not payable unless the employee establishes by competent medical authority that:
> > (i) There is a direct causal connection between the condition under which the work was performed and the cardiac condition; and
> > > (ii) The causative exertion occurs during the

actual period of employment stress clearly unusual to or abnormal for employees in that particular employment, irrespective of whether the employment stress is unusual to or abnormal for the individual employee; and

(iii) The acute symptoms of the cardiac condition are clearly manifested not later than four (4) hours after the alleged causative exertion.

Wyo. Stat. Ann. § 27-14-603(b) (LexisNexis 2015).

[¶19] The OAH concluded that Claimant met her burden of proving the first and third conditions. The element we are therefore concerned with is the second element, which in this case presents the question whether the causative exertion that caused Mr. Scherf's heart attack occurred during a period of employment stress that was unusual to or abnormal for an oiler. That is, was the exertion that Mr. Scherf had to use to open and close the access panel/fender on the front end loader unusual to or abnormal for an oiler?

[¶20] To answer this question, we use an objective test that examines only whether the employment stress causing the heart attack was abnormal or unusual for the particular employment. *Loomer v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2004 WY 47, ¶ 22, 88 P.3d 1036, 1043 (Wyo. 2004). The objective test "does not focus on the activities or characteristics of an individual employee." *Id.* (quoting *State ex rel. Wyo. Workers' Comp. Div. v. Harris*, 931 P.2d 255, 259 (Wyo. 1997)). Instead, the test "compares the employee's specific exertion to the usual exertion of *other employees engaged in the same or similar activity*." *Loomer*, ¶ 17, 88 P.3d at 1042 (citing *Matter of Desotell*, 767 P.2d 998, 1001 (Wyo. 1989)) (emphasis in original).

[¶21] We note at the outset of our review that the hearing examiner made numerous findings of fact and conclusions of law, but he made very few findings purporting to weigh the evidence or determine witness credibility. The Division, however, has disputed the suggestion that the findings are so inadequate as to preclude review. In its brief on appeal, it argues (with citations removed):

> Mrs. Scherf also takes issue that the hearing examiner made an inadequate determination on the exertion expended by Mr. Scherf. The sole evidence presented on this issue was Mrs. Scherf's testimony. The hearing examiner set forth the conversation Mrs. Scherf had with her husband on June 16th. As the hearing examiner explained, Mr. Scherf found it "very hard" to get the loader panel off due to dried mud. With only the testimony of Mrs. Scherf to support the amount of exertion, the hearing examiner believed that Mr. Scherf may

10

have exerted considerable effort. Ultimately though, the hearing examiner found that any extra exertion was specific to Mr. Scherf and not abnormal or unusual to the general industry.

[¶22] We accept the Division's contention that the hearing examiner implicitly accepted Claimant's testimony and Mr. Scherf's reported difficulty in opening and closing the loader's access panel in his conclusion of law paragraph 13:

> 13. Even if Mr. Scherf had to exert himself more than usual in opening and closing the panel to access the loader's engine oil on the day in question, while it may have been an employment stress unusual or abnormal for him, the Office is not convinced that it was clearly unusual or abnormal for oilers in this industry. This is the reason why Claimant's claim must fail.

[¶23] We turn then to our objective test for determining whether Mr. Scherf's exertion was unusual to or abnormal for an oiler, which we apply by comparing Mr. Scherf's specific exertion to the usual exertion of the other employees engaged in that same or a similar activity. *See Loomer*, ¶ 17, 88 P.3d at 1042. Based on application of this test, we conclude that the hearing examiner's conclusion is contrary to the overwhelming weight of the evidence.

[¶24] Every Mountain Construction employee who testified concerning the exertion required to service a loader and, in particular, to open and close the loader's access panel, testified that it is not generally a physically demanding or difficult task.

[¶25] Mike Frost, president of Mountain Construction, testified:

> Q. Getting back to the oiler position, is it a very strenuous position or job?
> A. It's not real strenuous. It's an active job, hands on. I guess it can be a little bit strenuous packing oil and a few things.
> Q. So doing the servicing on the loaders, is that strenuous?
> A. No.
> Q. Based upon what Sharen had said, can you figure out what panel we're talking about that was caked over in mud?
> A. It had to be the fender. It would have had to be the fender. It's about the only thing that could collect mud.

11

Q. What do you have to remove – do you have to remove the fender to access something to do servicing?

A. Pull the latch and the hinges open. Then there's a little panel that hinges to gain access to the oil, plugs, filter, and everything.

Q. To take the fender – is the fender on a hinge-type thing?

A. Yes.

Q. Does that take much effort at all?

A. It takes a few yanks, you know, to get it sliding. It's got a guide that helps support the fender when it operates. It just slides on it. With a few yanks or a pry bar you can get it open.

Q. Have you ever had it stick on you where you had to pull on it really hard and it gave you a lot of trouble?

A. I never had to open that one, I don't believe. I just observed it. I hadn't seen it ever stick, no.

\* \* \*

Q. And so when Bob was saying to his wife that the panel was stuck and covered with mud, that he had a hard time opening it and even a harder time closing it, that would be unusual for that piece of equipment?

A. Yes.

[¶26] Eric Smith, Mountain Construction's hot plant superintendant, testified:

Q. In the normal day-to-day servicing of the loader, is there anything that you really have to strain very much on?

A. No, not day-to-day. It just gets greased usually once a day. We have air greasers. That's usually at night too when we get it done or sometimes in the morning. A lot of times the loader operator does his own greasing anyway.

Q. In that 25-hour servicing, is there anything very strenuous about it?

A. No, not really.

Q. Is that something that if nobody was around and you were around, that you would do?

A. Yes.

Q. So you've done it many times before yourself?

A. Yes.

Q. Anything about it that you found very strenuous?

A.      No.

                \* \* \*

Q.      Have you ever known the fenders or any of these access panels to be corroded or not able to shut?

A.      Not so much. I mean, they all – not that I would think was too bad anyway.

Q.      Have you ever noticed it to be that way – in such a way that it would cause you problems getting any of the things opened or closed?

A.      Not that I have done or observed.

[¶27]  Jerry Tilley, an oiler for Mountain Construction, testified:

Q.      We'll go back to the loader. As far as opening the two fenders, and there's an access panel, we showed some videos of it this morning, is that something that an oiler would routinely have to do to perform maintenance on this machine?

A.      You have to open that fender to change the oil on it.

Q.      And there wouldn't be anything unusual or abnormal about having to open those panels?

A.      Not for me it wasn't.

[¶28]  Eric Schaefer, a superintendant for Mountain Construction, testified:

Q.      When you're performing maintenance on the loader, is it unusual to have it stick so that you have to strain and stress with opening up the fender?

A.      I mean, yeah. There's a million different circumstances that a loader could be in, you know, and there could be a time where it is strenuous to open it. Unusual, yes. I have never had a problem opening it.

                \* \* \*

Q.      In fact, are you aware of anybody who really had difficulties opening or closing those?

A.      No.

                \* \* \*

Q.      And the same thing is true on the other side, you have to exert some force to get the fender to open up, don't you?

A.      Yes.

                \* \* \*

Q. So when you open up the fender, it's still a pretty simple thing to just pull it open, correct?

A. Correct.

Q. And if it's stuck, that would be unusual, correct?

A. Yes.

[¶29] The overwhelming weight of the evidence establishes that it was unusual or abnormal to encounter an access panel that is stuck or physically "very hard" to open or close. The remaining question is whether the record supports the hearing examiner's conclusion that any difficulty Mr. Scherf experienced was unique to him—owing apparently to Mr. Scherf's personal and subjective physical abilities. We again conclude that the overwhelming weight of the evidence demands the opposite conclusion.

[¶30] Claimant testified that Mr. Scherf was 6'4", weighed approximately 225 pounds, was physically active at home, working on irrigation, gardening and fencing, and had no difficulty lifting. She further testified that they talked daily and he had no complaints about his job as an oiler and really liked what he was doing. Mike Foster, president of Mountain Construction, testified that Mr. Scherf was physically able to do his work and he had never known Mr. Scherf to complain about having any physical problems performing his work. Eric Smith, Mountain Construction's hot plant superintendant and Mr. Scherf's supervisor, testified:

Q. Did you observe Bob doing his job during that period of time in June?

A. Yeah, from what I could. I think it was only a few days. He's done it before, even before June.

Q. So servicing the loader that's there was something that he had done before?

A. Yes.

Q. And would you say he was very familiar with that job?

A. Yes.

Q. And was he familiar with the loader?

A. Yes.

Q. Did he ever have any problems when he was servicing the loader that you noticed?

A. No.

Q. Did he ever have any problems with opening the fender or – well, let's just go with that, opening the fender?

A. No, not that I observed.

14

Q. Did he ever have any problems with the interior panel underneath the fender that you needed to open up to service the stuff?

A. Not that I'm aware of.

[¶31] Eric Smith further testified that he was fifty years old, 5'10", and weighed 225 to 230 pounds. In comparing his physical ability with that of Mr. Scherf, he testified:

Q. What about his strength, how would you rate his strength?

A. He would probably do about mostly what I would be able to do.

Q. Do you consider yourself very strong?

A. Average, I guess. I'm not exceptionally strong.

Q. You're average for the type of construction work among the work crew you work with?

A. Yeah, for my age and for my job. Mine is not quite as physical as other ones most of the time. I guess it gets real physical when we're moving a hot plant. That's when I do the most work as far as physically.

Q. And would Bob help you move the plant as well?

A. Yeah.

Q. What's involved in moving a plant? What's so physical about it?

A. It depends on what you're doing. You've got to disassemble it and load it on trucks and move it to the next one and set it up. There's various jobs. The laborers come and – there's quite a few people – crews that do it.

Q. Is there lifting involved?

A. Yeah.

Q. Of like how many pounds?

A. A hundred pounds or so. If it gets too heavy, you can get equipment to do it.

Q. Did Bob have any trouble moving up to a hundred pounds?

A. I don't know if he ever really – not any more than anybody else I guess. He didn't usually have to do too much of that.

Q. But he would dive in and do his part?

A. Yeah.

Q. Did you ever notice him having any problems physically?

A.       No.

[¶32]   Eric Shaefer, a superintendant for Mountain Construction, testified:

> Q.       Did Mr. Scherf ever complain to you or did you ever overhear him complaining about difficulties performing this job as an oiler?
> A.       No.
> Q.       He had only been performing it for a few days, hadn't he?
> A.       Yes.
> Q.       But he had performed maintenance on the loader prior to that?
> A.       Yes.

[¶33]   The record contains no evidence contradicting the foregoing evidence that Mr. Scherf was physically able to perform his job and had no complaints concerning the effort required in performing the tasks of an oiler.  There is simply no evidence in the record to support the hearing examiner's conclusion that if Mr. Scherf experienced an unusual employment stress, it was due to his own individual circumstances.

[¶34]   As a final matter, we address two findings in the OAH order that seem to suggest that an accumulation of mud on the loader would not have made the panel difficult to open and close.  The hearing examiner found:

> 25.       Mr. Tilley, who worked on the crusher, had changed the oil many times on the 980G loader.  He testified that he didn't really remember seeing mud about the upper fenders or not, and that he probably didn't pay close attention to it, but certainly did not remember mud being so bad that he had trouble opening or closing the latch.  He considered the changing of the oil on the piece of equipment to be routine and normal.  Testimony of Mr. Tilley.
> 26.       Images and a video of the loader in question were admitted into evidence as Exhibit S-G.  An electric motor opens the engine hood and [the] fenders on the left and right front side which are opened by pulling on a latch, after which it opens by way of hinges revealing a small panel which unhinges which is opened to gain access.  * * * The photographs and video of the loader admitted into evidence were taken in January 2013.  Testimony of Mr. Tilley and Mr. Schafer.  Some mud is noted to be on the equipment but this did not result in any apparent difficulty in opening and

closing the latch for the individual demonstrating how it was done. Exhibit S-G.

[¶35] First, with respect to the findings in paragraph 26, the video referenced was taken, as indicated, about a year and a half after Mr. Scherf's June 11, 2011 heart attack. No testimony was offered to describe the condition of the loader on June 16, 2011 or to correlate its condition on that date with the condition reflected in the video. In short, no foundation was offered to suggest that the images viewed on the video bore any resemblance to the condition of the loader on June 16, 2011. Thus, while the video may have been instructional, it was of no relevance to the question of the conditions encountered by Mr. Scherf and their difficulty.

[¶36] With respect to Mr. Tilley's testimony referenced in paragraph 25, the finding appears to suggest a reference to the date of Mr. Scherf's heart attack. In fact, the testimony came in response to questions about the January 2013 photographs of the loader:

> Q. Have you ever – well, there's some photographs laying on the bench there in front of you. Those are copies of some photos that are marked as Exhibit State G. That very first one that's marked 48, what is that that that's showing a picture of?
> A. There?
> Q. Yes, sir.
> A. That looks like the latch on the fenders.
> Q. You weren't there the day these photographs were taken in January, were you?
> A. I was there, but I wasn't – I was on the job, but not by the machine.
> Q. I'm looking at this photograph and I can see some mud spattered up there. The part that we're looking at is the upper part of the fender, is it not?
> A. Yeah.
> Q. Right where the fender breaks away?
> A. Where the latch is.
> Q. And the latch has got a little bit of mud on it, doesn't it, there?
> A. Probably. It looks like mud.
> Q. Have you seen much more mud than that on that particular part of this loader?
> A. I've never paid that close attention.

17

Q.      If it had been covered with mud so bad that you had trouble getting it open, isn't that something you would remember?

A.      Probably.

[¶37]  Mr. Tilley was asked no questions concerning the condition of the front end loader in June 2011, and he offered no testimony on that question.  Based on the record, we find that neither paragraph 25 nor paragraph 26 lends support to the hearing examiner's conclusion that any unusual exertion Mr. Scherf experienced on June 16, 2011 was unique to his personal circumstances.

## CONCLUSION

[¶38]  The OAH conclusion that any unusual or abnormal employment exertion Mr. Scherf experienced was not unusual to or abnormal for oilers generally is contrary to the overwhelming weight of the evidence.  We therefore reverse and remand to the district court for entry of an order remanding to the OAH for entry of an order awarding benefits.